UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

**MARY de SUZE, LOUISE GRANT**
**PETRA MONTGOMERY, CARLOTA BROWN**
**LEONARD ANDRE, RENEE AVENT, ARLENE HIPP**
**DEBORAH PRIESTER, ANGELA JONES,**
**ELVIA SCHARSCHMIDT,**
**AND PAMELA LOCKLEY,** and for other
similarly situated current or former tenants of Linden Plaza,

Civil Action No.

**CV 18 - 180**

**COMPLAINT**

*Plaintiffs,*

-against-

**GARAUFIS, J.**

**BEN CARSON, SECRETARY OF THE UNITED STATES**
**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,**
**THE UNITED STATES DEPARTMENT OF HOUSING AND**
**URBAN DEVELOPMENT;**

**REYES, M.J.**

**LINDEN PLAZA PRESERVATION L.P.;**
**LINDEN PLAZA ASSOCIATES, L.P.; and**

 **ORIGINAL**

**NEW YORK CITY DEPARTMENT OF HOUSING**
**PRESERVATION AND DEVELOPMENT,**

*Defendants.*

-------------------------------------------------------------------------------X

Plaintiffs Mary de Suze, Louise Grant, Petra Montgomery, Carlota Brown, Leonard

Andre, Renee Avent, Arlene Hipp, Deborah Priester, Angela Jones, Elvia Scharschmidt and

Pamela Lockley, for themselves and other similarly situated current or former tenants of Linden

Plaza and through their attorneys, Brooklyn Legal Services Corporation A, by Gregory E. Louis,

Esq., and complain against Defendants (i) Ben Carson, Secretary of the United States

Department of Housing and Urban Development as well as the department he heads ("HUD"),

(ii) both Linden Plaza Preservation, L.P. and Linden Plaza Associates L.P. ("Owner"), and (iii)

the New York City Department of Housing Preservation and Development ("HPD"), alleging to

this Court as follows:

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **JAN 1 1 2018** ★

BROOKLYN OFFICE

## INTRODUCTION

1.  Through this action under the Administrative Procedures Act, the Enforcement Act of 1871, and New York state common law, longstanding and former tenants of Linden Plaza seek to demonstrate that their interest in affordable housing converges with the public interest in avoiding waste.

2.  Over the past decade, hundreds of households who have called Linden Plaza, a 1,527-unit state and federally subsidized rental project, home for decades have perversely and ironically struggled after their rents doubled or tripled *because of* a "preservation transaction" approved by HUD.  Simply to pay the inflated rents, low-and-moderate income families have gone hungry, dispensed with childcare, taken out high interest loans, put off live-saving medical treatment, or prematurely invaded retirement plans lest they end up homeless.  Some, like Petra Montgomery, became permanently homeless where, after having exhausted all desperate alternatives, they were inevitably evicted.  Others have succumbed to illnesses or even taken their lives due to the stress of the omnipresent specter of eviction.

3.  Over the decades Plaintiffs named here intrepidly commenced eight (8) *pro se* lawsuits – six (6) in federal court and two (2) in state court – because responding to desperate urgency of eviction and this gross injustice cannot wait for finding affordable lawyers willing to take this matter on.  And as elaborated further in the "Facts" below, these lawsuits have proven to be fruitful as they have provoked HUD and HPD to provide documents forming the factual basis for this lawsuit; documents that were not disclosed to Plaintiffs and other residents in Linden Plaza-in violation of both state and federal law.

4.  Simply put, the documents disclosed by United States attorneys in 2014 and then by HPD in March 2016, substantiate what Plaintiffs and many had intuited when, somehow, a "preservation transaction" left them infinitely worse off than they would be in a market development: that the entire process for increasing tenants' rent was flawed because it is based on impermissible data.

5.  Rents at Linden Plaza doubled and tripled because Owners' applications to HUD for rental increases were approved based on (i) $50 million dollars of additional financing that Owner never in fact received according to public records, and (ii) items that simply cannot be included in the rents that will be charged under state laws.  As the documents Plaintiffs obtained demonstrate, and in contravention of Congress' purpose in authorizing preservation transactions, Linden Plaza tenants have been saddled with the entire cost of Owner's speculative purpose.

6.  So, Plaintiffs bring this lawsuit challenging Defendants' actions both to vindicate their property interests and the public's interest in ensuring that federal dollars are spent on affordable housing, not on facilitating real estate speculation.

**PARTIES**

7.  Plaintiffs Mary de Suze, Louise Grant, Petra Montgomery, Carlota Brown, Leonard Andre, Renee Avent, Arlene Hipp, Deborah Priester, Angela Jones, Elvia Scharschmidt, and Pamela Lockley are each longstanding or former tenants of Linden Plaza; they reside or resided in various apartments at Linden Plaza with their families, many from the opening of Linden Plaza until the present day.

8. Defendant Ben Carson is current head of HUD. HUD is a federal agency established, amongst other reasons, to administer the principal programs of the United States government that provide assistance for housing, which programs include Section 236 of the National Housing Act.

9. Defendants Linden Plaza Preservation and Linden Plaza Associates, each New York limited partnerships, are former and current beneficial owners of the Linden Plaza Housing Company, and the development. In July 2007, Linden Plaza Associates lodged an application to HPD, for Mitchell Lama rental increases described further below in the "Facts" section.

10. Defendant HPD is a department that represents the City of New York in carrying out the provisions of Article II of New York State's Private Housing Finance Law, commonly known as the "Mitchell Lama law." Defendant HPD is also the public housing agency responsible for supervising the fulfilment of obligations under the federal Section 236 program requirements on behalf of HUD.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 5 U.S.C. § 702. It has jurisdiction over state claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because it lies in the judicial district where a substantial part of the events or omissions giving rise to the claims occurred and where the property that is the subject of this action is situated.

## FACTS

A. **Section 236 Scheme Generally and Preservation Transactions**

4

13. Congress enacted Section 236 of the National Housing Act ("Section 236") for the purpose of reducing rentals for lower income families by authorizing the Secretary of HUD to make periodic interest reduction payments to a rental project designed for occupancy by lower to middle income families.

14. The assistance the federal government provides to owners under Section 236 is a subsidy bringing the amount of an owner's interest payments under the mortgage for the project to 1%.

15. Section 236 assistance applies to uninsured (or non-insured) projects, or ones whose mortgage is not insured by the federal government. Often, such projects involve mortgages that are financed or insured by state or local programs.

16. The rent increase procedures for uninsured (or non-insured) rental projects are found in the Code of Federal Regulations: 24 CFR § 245.330.

17. Rents in projects subsidized under Section 236 are (i) a basic rental charge, and (ii) a fair market rental charge.

18. The basic rental charge is calculated as the amount needed to operate the project with payments of principal and interest due under a mortgage to 1%.

19. The fair market rental charge is calculated as the amount needed to operate the project with payments of principal, interest, and mortgage insurance premium which the mortgagor is obligated to pay under the (terms of the specific) mortgage.

20. Where there is an uninsured mortgage financed by a state agency, the fair market rental charge must adhere to the state terms and rent restrictions.

21. Under Section 236, HUD is authorized to continue making interest reduction payments ("IRP") to a project whose mortgage has been refinanced if the owner enters into such

binding commitments as the Secretary of HUD may require as to ensure that the owner will continue to operate the project in accordance with all low-income affordability restrictions under Section 236.

22. HUD issues such continued IRP occur as part of what are known as preservation transactions. The transfer of IRP to a new mortgage under a preservation transaction is known as a decoupling.

23. In order to qualify for continued IRP, owners must submit a plan of action to HUD. HUD may approve the plan of action only upon a twelve-part finding that includes requirements that (i) the package of incentives set forth in the plan of action is, for the federal government, the least costly alternative that is consistent with the federal purposes, and (ii) current tenants will not be involuntarily displaced, except for good cause.

24. Federal purposes governing the plan of action include (i) the preservation and retention of housing affordable to low income families or persons residing in privately owned dwelling units that were produced for such purpose with federal assistance, (ii) minimizing the involuntary displacement of tenants currently residing in such housing, and (iii) facilitating the federal government's partnership with state and local governments and the private sector in the provision and operation of housing that is affordable to very low, low, and moderate income families.

25. In 2007 and 2008, HUD approved continuing IRP and rent increases, following the procedures under HUD Notice H 00-8.

**B.  <u>Rent Increase Procedure in Uninsured Section 236 Projects</u>**

26. Federal regulations prescribe the following procedure for rent increase in uninsured or non-insured Section 236 projects:

a. The owner must serve tenants with a notice of a proposed rent increase. Among other things, the notice must (i) state the reason for the projected increased basic and fair market rental charges, (ii) contain a paragraph advising tenants that copies of materials that they are submitting to the state or local agency administering the Section 236, in accordance with HUD regulation 24 CFR § 245.330, are available to them, and (iii) offer the tenants a specific time period to comment on the proposed rent increases.

b. The owner must then submit to the state or local agency (i) copy of the notice to the tenants, (ii) the annual statement of profit and loss, (iii) a narrative statement of the reasons for the requested rental increase, (iv) an estimate of the reasonably anticipated increases in project operating costs that occur within twelve months of the date of submission of materials, (v) tenant comments regarding the proposed rent increases and, (vi) the owner's evaluation of the tenant comments.

c. Along with the financial data, the state or local agency must forward the owner certification to HUD that:

    i. The owner has complied with all requirements

    ii. Copies of the materials submitted in support of the proposed increase were located in a place reasonably convenient to tenants in the project during normal business hours and that requests by the tenants to inspect the materials, as provided for in the notice, were honored;

    iii. All comments received from tenants were considered by the mortgagor in making its evaluation; and

        iv. All statements are true, correct, and complete, under the penalties of 18 U.S.C. § 1001

d. The state or local agency must certify the owner's compliance with the procedure and then determine to approve, adjust upward or downward, or disapprove the owner's request for the maximum permissible rents to be charged in the property.

e. If the state or local agency determines to disapprove the owner's request for a rent increase, there is no "HUD review" of the state or local agency's decision to deny the owner's request for an increase. The rent increase denial stops at the local agency and never proceeds to HUD.

f. If the state agency approves or adjusts the owner's request, then it must submit to the local HUD office all materials, which includes tenant comments, and the owner and agency reviews of the "tenant comments".

g. Finally, HUD reviews the agency's determination, tenant comments and, within 30 days, notifies the state or local agency of its approval, adjustment upward or downward, or disapproval of the proposed rent increase

## C. Mitchell-Lama Rental Housing Generally and Preservation of Mitchell-Lama Housing

27. Article II of New York State's Private Housing Finance Law is vastly different to Section 236 of the National Housing Act.

28. Housing Companies organized under Article II of New York State's Private Housing Finance Law are also called "Limited Profit Housing Companies" or "Mitchell Lama Housing Companies."

29. The Mitchell-Lama housing program, as it is commonly known, is a government guarantee designed to accommodate the housing needs of moderate-middle income people.

30. In exchange for no cost land, very low-interest rate mortgage loans, and generous real property tax exemptions, owners agree to charge rental rates that are around half the prevailing market rate for the area where the project is located; they also agree to accept a mandatory limit on their profits.

31. The initial maximum permissible rental charge for each dwelling unit is calculated as the amount per-room-per-month rate needed to operate the project; including two tenant reserve funds, a sinking fund, with payments of principal, 5 % interest which the mortgagor is obligated to pay under the Mitchell Lama mortgage, and 7 ½ percent profit for the owner.

32. Initial and subsequent, maximum permissible rents charged in Mitchell Lama units are determined by the total number of rooms in the unit; and if the unit has a balcony.

33. Eligibility for admission to occupy a Mitchell-Lama unit is based on a unique provision in the law that determines the household's "probable aggregate annual income".

34. Mitchell-Lama tenants are not required to pay 30% of their income for rent; most moderate-income Mitchell Lama households pay 10% - 25% of their income for rent.

35. Under the Mitchell-Lama tenant protect law passed by the New York State Legislature in 2004, HPD was authorized to approve mortgage restructuring at no additional cost to the tenants.

36. Any rent increases approved during this time had to be related to increases in operating and Mitchell Lama approved, fixed expenses.

9

## D. **Mitchell-Lama Rent Increase Procedure**

37. Mitchell-Lama regulations prescribe the following procedure for rent increase for

projects:

a. The owner must submit to HPD a petition to notify tenants of a proposed increase in

the per-room-per-month rental rate.

b. Among other things, the petition must state the projected cost per-room-per-month to

be increased and contain a paragraph advising tenants that copies of the materials are

available to them for review.

c. Once HPD confirm receipt of the petition and agrees to review the owners request,

the agency will set a time, date, and place where a public hearing will be held.

d. The owner must then serve the tenants (i) a copy of the notice along with HPD's

acknowledgement letter, (ii) the petition containing the annual statement of profit and

loss, (iii) a narrative statement of the reasons for the requested in rental increase, and

(iv) an estimate of the reasonably anticipated increases in project operating costs

based on Mitchell-Lama budgetary needs projection within 3 years of the date of

submission of materials.

e. Tenants have the right to comment at the hearing or in writing during the comment

period specified in the notice. Tenant testimony at the hearing must be given the same

weight as written comments.  Mitchell-Lama law requires full disclosure of all

recommendations being utilized to increase the rental charges.

f. If HPD determines that an increase should be granted, HPD's Commissioner issues

an order specifying the amount of the increase and the date(s) of implementation.

g. If the Mitchell Lama development has a mortgage that is not insured by HUD, then the rent increase request and supporting documents, including tenant comments, must be sent to HUD for final approval before HPD's Commissioner issues a rent increase order. This regulation is applicable to Linden Plaza.

h. Prior to the issuance of the Commissioner's rent order, HPD must make available to both the owner and the Tenants Association or their respective representatives the agency's determination to approve, adjust, or disapprove the owner's request.

**E. General Facts About Linden Plaza**

38. In 1971, Linden Plaza Housing Complex was opened.  At the time that it opened, it contained 1,527 units across four, 17 story high-rise buildings, one 18-story building, 32 town house units located at 671-765 Lincoln Avenue and 750-792 Eldert Lane in Brooklyn.

39. One year later, in 1972, the New York City's Housing Development Corporation ("HDC") issued to Linden Plaza a mortgage insured by the State of New York under Article II of the New York Private Housing Finance Law ("Mitchell-Lama Law").  As a result, Linden Plaza and its rents are governed by the provisions of the Mitchell-Lama Law.

40. In 1973, Linden Plaza began receiving mortgage interest reduction assistance under HUD's Section 236 Program.

41. When Linden Plaza opened in 1971, the interest rate for most market rate mortgages was above 9%. Under the below-market, Mitchell Lama Program, Linden Plaza's mortgage interest rate was 5%.  Once HUD began making 236 Interest Reduction Payments in 1973, Linden Plaza's mortgage interest rate dropped to 1%

42. Legal title to Linden Plaza is in the name of Linden Plaza Housing Co., Inc. ("Plaza Housing"), a corporation organized and formed under the Mitchell Lama law.

11

43. In 1971 Linden Plaza Associates acquired beneficial ownership of Linden Plaza.  In April 2006, its name was changed to Linden Plaza Associates LP. In April 2008, Linden Plaza Associates LP transferred its beneficial ownership to Linden Plaza Preservation, L.P.

44. HPD has supervisory authority over Linden Plaza by virtue of its status as a Mitchell-Lama project within New York City and its mortgage financing from HDC.

45. At the time when Linden Plaza Preservation acquired beneficial ownership of Linden Plaza, the Mitchell Lama tax exemptions were set to expire. The outstanding mortgage balance was $31 million dollars.  The original city financed mortgage was $51 million.

46. As a consequence of the expiring tax exemptions, Linden Plaza was set to leave the Mitchell-Lama Program

47. By virtue of New York law, if Linden Plaza had left the Mitchell-Lama Program, then Linden Plaza would have become a rent-stabilized housing project based on its total number of units and the year in which it was constructed.

**F.  The Linden Plaza Preservation Transaction and Rental Increases**

48. In June 2007 and before acquiring beneficial ownership of Linden Plaza in April 2008, Linden Plaza Preservation, through its acquisition consultant Skyline LLC, applied to HUD for approval of an IRP decoupling and rental increases.

49. A month later (July 2007), Linden Plaza Associates applied to HPD, for approval of a Mitchell Lama rent increase; this rent increase application did not include any of the decoupling expenses that were being reviewed by HUD.

50. Instead of sending HUD a pre-approval of Mitchell Lama rent increases based on the July 2007 rent increase application, HPD cancelled their approval and replaced the Mitchell Lama rents with the  "basic rents" that were approved by HUD on December 14, 2007.

51. The Plaintiffs were unaware that Skyline LLC and HUD had negotiated rent increases behind the scenes until 2011 and 2013- four (4) and six (6) years later.   The former Tenant Association and the tenants, which includes the Plaintiffs, were denied the opportunity to review and comment on Skyline's application prior to HUD's acceptance, review and approval of the decoupling expenses and rents.

52. Under both NYS Mitchell Lama law, and federal regulations under the National Housing Act, full disclosure regarding the basis of rent increases must be afforded to tenants affected by those rent increases. The Plaintiffs and other tenants were kept in the dark; Plaintiffs were unaware that 24 CFR § 245.330 was the applicable procedure for Linden Plaza's rent increases - including HUD's decoupling increases, and that the regulation only permits HUD to accept rent increase requests from HPD as the state or local agency.

53. Skyline LLC's recommendations submitted to HUD in June 2007 were not introduced during the Mitchell-Lama hearing held on August 27, 2007.   Tenants were denied the right to comment at the hearing or in writing on Skyline LLC's recommendations to increases the rental rates.

54. By accepting, and then approving Skyline LLC's rent increase request, HUD denied the Plaintiffs and their former attorneys, the right to effectively challenge HUD's decoupling rent increases in 2007-2008.

55. On April 9, 2008, the date Linden Plaza was sold, new owner Linden Plaza Preservation paid off the original, 1972 mortgage and sought to obtain a second mortgage.   Tenants never received notice that the original mortgage was being paid off and that the property was being sold.

56. At the time of its application for approval of IRP decoupling and a rent increase in 2007, Robert Vaccarello was president of the management company, RY Management Co., Inc, who oversees the day-to-day operations in Linden Plaza.

57. From 1980 till present, RY Management Co., Inc. has been managing agent for former beneficial owners Linden Plaza Associates and current beneficial owner Linden Plaza Preservation.

58. At the time of the application for rental increases in 2007, Plaintiffs each were tenants at Linden Plaza.  Plaintiff Pamela Lockley was a member of the former tenant association's captain-co-Captain committee. Plaintiff Pamela Lockley was one of five captains for her building, 735 Lincoln Ave. Since January 2010, Pamela Lockley has been the President of the newly organized, Linden Plaza Leaseholder's Tenant Association Council.

59. In connection with its request for an IRP decoupling, Linden Plaza served upon Plaintiffs and other tenants at Linden Plaza a notice, dated May 8, 2007, entitled "A Request to HPD and HUD for Approval of an Increase In Maximum Permissible Rents" ("2007 Increase Notice"). The notice proposed that rents be increased as provided in the chart below and also contained an advisory that "A copy for [sic] the materials that we are submitting to HPD and HUD in support of our request will be available during normal business hours at 1619 Third Avenue, New York, NY 10128 (2[nd] Floor) for a period of 30 days for [sic] the date of service of this notice for inspection and copying by tenants of Linden Plaza Associates and, if the tenants wish, by legal and other representatives acting for them individually or as a group"

| The monthly rent increases for which we have requested approval are: | | |
|---|---|---|
| | Present Rent | Proposed rent |

| Studio | 361.00 | 890.00 |
|---|---|---|
| Studio/Terrace | 412.00 | 940.00 |
| 1 BR | 492.00 | 1,155.00 |
| 1BR/Terrace | 542.00 | 1,205.00 |
| 2BR | 614.00 | 1,280.00 |
| 2BR/Terrace | 664.00 | 1,330.00 |
| 3BR | 808.00 | 1,435.00 |
| 3BR/Terrace | 859.00 | 1,485.00 |
| 2BR Townhouse | 664.00 | 1,285.00 |
| 3BR Townhouse | 808.00 | 1,335.00 |

60. Shortly after Plaintiffs and, on Plaintiffs' information and belief, all tenants at Linden Plaza were served a copy of the May 8, 2007 notice, Plaintiff Pamela Lockley on behalf of herself and the tenants in her building, 735 Lincoln Ave, called RY Management's site office located in the next building at 675 Lincoln Ave.  Plaintiff Pamela Lockley requested a time to go and inspect the materials that Owner would be submitting to HUD and HPD, as provided in the Initial Notice.

61. The receptionist told Plaintiff Pamela Lockley that she did not need to come in because all the materials that the Owner intended to submit in connection with the rent increase application would be served upon the tenants at a later date.  The RY Management receptionist reassured Plaintiff Pamela Lockley that the materials referred to in the May 8 Initial Notice would be mailed to all tenants at Linden Plaza.  Based on past procedure tenants had become accustomed to since 1971, everyone, including Plaintiff Lockley had

every reason to believe that the proposed rent increases would be based on Mitchell Lama approved operating costs and expenses.

62. A few weeks after Plaintiffs asked to review the material to support the rent increases listed on the Initial Notice, Plaintiffs and, on Plaintiffs' information and belief, all tenants at Linden Plaza, received a document entitled "Application by Linden Plaza Associates, L.P. for Rent Increase," dated June 8, 2007 ("June 2007 Application").  Annexed to the June 2007 Application were (i) projected income and expenses, (ii) other income, (iii) operating expenses, and (iv) utility expenses. Based on the notices tenants received and the reassurances from RY Management a few weeks earlier, the Plaintiffs and other residents had no reason to suspect that expenses listed on the rent increase application would be replaced by, or supplemented with decoupling-related expenses.

63. Plaintiffs provided written comments, and attended one (1) public hearing and two (2) public meetings about the rent increases that took place between July and September 2007.  In their written comments, and during the public hearing and meetings, Plaintiffs, their accountant, and the former Tenant Association, strongly challenged the rent increase percentages that Linden Plaza Associates was asking HPD to approve.

64. At the time Plaintiffs' provided written comments and attended the public meetings, Plaintiffs, their then- accountant, the former Tenant Association and their then-attorneys hired in February 2008, had no idea that Skyline LLC simultaneously submitted rent increase data to HUD in June 2007 that differed from the data contained in the June 7, 2007 rent increase petition that the Plaintiffs and other tenants received.

65. Despite Plaintiffs' comments, and objections from their former accountant and former attorneys, Plaintiffs and on Plaintiffs' information and belief, all tenants at Linden Plaza,

16

were served with a HUD approved order that was processed by HPD, dated March 28, 2008, approving rental increases and entitled "Commissioner's Order ML-537."

66. To date, the owner or its agent RY Management, never served the Plaintiffs nor (on their information and belief) any other tenants in Linden Plaza, a copy of HUD's 2007 decoupling rent increases, which also included 236 market rents; there was no reference to these 236 market rents in the March 28, 2008 rent order.

67. Until the state and federal court cases were filed between 2011 and 2013 (elaborated further below in subsection G of this "Facts" section), Plaintiffs had no idea that the decoupling rent increases were solely based on the decoupling debt that was submitted to HUD from Skyline LLC.

68. Until being served by the US Attorney's office in federal court in 2013, the Plaintiffs had no idea that the HUD-approved rent increases were based on $140 million of (non-Mitchell Lama) decoupling debt.

69. Against its own regulations, HUD accepted a rent increase application from an entity that is not a state or local agency, meaning that HUD acted upon these rent increases without pre-approval from HPD.

70. Also against its own regulations, HUD approved rental increases well above 10% annual increases without having first published a waiver in the federal register; and this was so even though its approval resulted in out-of-pocket increases to the tenants that averaged a total 93% in 2 years.

71. Plaintiffs Mary de Suze and Louise Grant were notified, for the first time of HUD's approval of decoupling increases, in April 2011 during their appearance in a state court action. Petra

Montgomery learned of HUD's involvement when she was added to the state court case in 2012.

72. Until April 2011, no tenant had any idea that HUD's decoupling rent increases cancelled out the Mitchell Lama rent increases that HPD was asked to approve under Mitchell Lama law.

73. In 2014, HUD approved another three-phase rent increase, dated March 28, 2014., HPD processed HUD's rent increase approval and notified Linden Plaza tenants, including the Plaintiffs, of HUD's approval.

74. As a result of the 2008-2010 and 2014-2016, HUD approvals, Plaintiffs saw their rents increase as follows:

| Plaintiff | Rent In 2007 | Rent in 2010 | Rent in 2014/2015 | Rent in 2016 |
|---|---|---|---|---|
| Mary de Suze | $656.00 | $1,265.00 | $      1,325.00      /  $1,352.00 | $1,393.00 |
| Louise Grant | $859.00 | $1,659.00 | $1,702.00 /$1,737.00 | $1,789.00 |
| Petra Montgomery | $656.00 | $1,265.00 | (evicted-Jan 2013) | N/A |
| Carlota Brown | $1,065.00 | $1,659.00 | $1,702.00 /$1,737.00 | $1,789.00 |
| Leonard Andre | $664.00 | $1,279.00 | $1,497.00/$1,528.00 | $1,574.00 |
| Renee Avent | $664.00 | $1,279.00 | $1,497.00/$1,528.00 | $1,574.00 |
| Arlene Hipp | $656.00 | $1,265.00 | $1,325.00/$1,352.00 | $1,393.00 |
| Deborah Priester* | $1,065.00 | $1,659.00 | $1,497.00/$1,528.00* | $1,574.00* |
| Angela Jones | $ 614.00 | $1,190.00 | $1,393.00/$1,422.00 | $1,464.00 |
| Elvia | $ 656.00 | $ 1,265.00 | $      1,325.00      / | $1,393.00 |

| Scharschmidt | | | $1,352.00 | |
|---|---|---|---|---|

\*\* Deborah Priester downsized from a three- bedroom w/balcony apartment, to a two-bedroom w/balcony apartment, prior to the 2014-2016 rent increases.

## G.   Discovery of Concealed Procedural Defects

75. After the Initial Increase Orders, in 2011, Plaintiffs Mary de Suze and Louise Grant commenced a proceeding in state court captioned and entitled *De Suze v Linden Plaza Preservation*, Index No. 3588 ("State Court Proceeding").   That state court proceeding, which is still pending, contends that certain "HUD Excess Charges" that Owner assessed against Plaintiffs de Suze, and Grant are not authorized.   Plaintiffs de Suze, and Grant originally commenced this proceeding against Owner and HPD.   By order dated August 8, 2011, HPD was dismissed from the proceeding after it filed a motion to dismiss rather than respond to Plaintiffs de Suze, and Grant's demand for documents.

76. In 2013, Plaintiffs de Suze, Grant, and Montgomery lodged a Freedom of Information Law request with HPD for all documents in HPD's possession relating to the preservation transaction and rental increase applications.   Plaintiffs de Suze, Grant, and Montgomery did this at the suggestion of Counsel representing HPD, where the Plaintiffs and HPD entered into a stipulation that was signed off by the judge in the State Court Proceeding.

77. Then in 2013, Plaintiffs Mary de Suze, Louise Grant, and Petra Montgomery commenced a *pro se* action before this Court charging that HUD, HPD, Owner (and its agents), and Darryl C. Towns, Commissioner of New York State Homes and Community Renewal, through their misfeasance or malfeasance, had caused damage to Plaintiffs.   The action was captioned *DeSuze et al v. Donovan et al,* 13 CV 2093 (JG)(LB) ("2013 Federal Action").

19

78. Like Plaintiffs Mary de Suze, Louise Grant and Petra Montgomery in 2013, Plaintiffs Carlota Brown, Leonard Andre, Renee Avent, Arlene Hipp, Deborah Priester, and Elvia Scharschmidt, also commenced *pro se* actions before this court charging that HUD, HPD, Owner (and its agents), and Darryl C. Towns, Commissioner of New York State Homes and Community Renewal, through their misfeasance or malfeasance, had caused damage to Plaintiffs. Their actions were captioned: *Brown v Donovan et al,* 13 CV 2090 (JG)(LB*); Andre v Donovan et al,* 13 CV 2091 (JG)(LB)*; Avent v. Donovan,* 13 CV 2088 (JG)(LB)*; Hipp v. Donovan,* 13 CV 2087 (JG)(LB)*; Priester v. Donovan* 13 CV 2089 (JG)(LB)*; Scharschmidt v. Donovan* 13 CV 2644 (JG)(LB) ("2013 Federal Actions").

79. Before the Court dismissed the 2013 Federal Actions for lack of subject-matter jurisdiction over the claims, during a hearing before this Court on or about August 23, 2013, attorneys representing HUD handed to Plaintiff de Suze, a financial statement dated at the bottom: November 15, 2007, relating to the preservation transaction and rental increase application ("November 2007 Financial Statement").

80. During the same Federal Court hearing, attorneys for HUD represented that HUD's approval of the Initial Rent Increase was based on the November 2007 Financial Statement.

81. Plaintiffs saw the information contained in the November 2007 Financial Statement for the first time, in Federal Court on August 23, 2013.

82. The information contained in the November 2007 Financial Statement, that HUD used as a basis for the 93% rent increases, contains figures that were not stated in the June 2007 Application.  For example, it contains $50.8 million acquisition costs, whereas the June 2007 Application does not contain any acquisition costs.  Also, the November 2007 Financial Statement reflects $73.1 million-dollar rehabilitation and related costs for items that were not

20

included in the June 2007 Application.  Finally, it contains a $16.0 million-dollar developer fee cost which was not in the June 2007 Application.

83. The Mitchell-Lama Law does not allow acquisition costs to be included in Mitchell Lama rents.

84. Mitchell Lama Law does not allow renovation costs that are added to the rents, to be permanent; these renovation costs are always temporary and the raised rents revert after three (3) years.

85. For several years, Plaintiffs de Suze, Grant, and Montgomery's submitted numerous FOIL requests in accordance with the stipulation mentioned above between those Plaintiffs and HPD. The purpose of the FOILs was to ascertain how much, and what expenses were reflected in their rents that were approved by HUD and processed by HPD.

86. Finally, in March 2016, HPD's FOIL Appeals Unit, provided those Plaintiffs with a memorandum, dated April 8, 2014 ("FOIL Memorandum"). The FOIL Memorandum states that the actual cost of renovations was only $20 million.

87. The figure in this FOIL Memorandum materially conflicts with the November 2007 Financial Statement, which claim that renovation costs were projected to be $ 57 million.

88. In addition, public documents show that HDC only issued bond financing in the amount of $73 million.

89. However, rentals at Linden Plaza continued to be based, in part, on the projected financing of $140 million.

90. Accordingly, there is about a $70 million difference in the amount of financing Linden Plaza applied for and the amount that it actually received.

91. Despite the variance between projected and actual costs, to date neither HUD nor HPD has ever directed Owner or their agents to reduce the rents to reflect the actual cost of the renovations, which, based on HPD and HDC's documentation, the cost for the renovations was $0. The $20 million renovation cost confirmed by HPD (HPD's April 8, 2014 FOIL Memorandum) is the exact amount of equity that was available to the new owners when the mortgage was refinanced. The memorandum confirms the refinancing and renovation debt was totally absorbed by the equity from the old mortgage. The over-inflated decoupling debt was approved as a means to justify outrageous rent increases.

**H. Impact and Aftermath of Rental Increases**

92. When the mortgage was refinanced, the majority of tenants/households lived in Linden Plaza for more than 20 years.

93. A number of the tenants/households moved into Linden Plaza during the first 10 years the development opened, the years 1971 through 1980. The Mitchell-Lama program guaranteed these young families, individuals who were moving out on their own for the first time, and veterans returning from Vietnam, decent, safe, and affordable housing for the long-term at below market rates.

94. Over the years these first families and individuals became accustomed to the benefits of the rent protections afforded them under the Mitchell-Lama program. In 2008-2010, these families and individuals, who lived in the developments for several decades, found themselves totally unprepared for the financial devastation caused by HUD's housing preservation program.

95. As elaborated below, the effect of the explosion in rent has been utterly devastating on the Plaintiffs and their neighbors. The following events are illustrative of the impact:

a. more than 150 non-payment housing court cases per week between the years 2008 through 2013;

b. long-time residents evicted (approximately 30% of the 1,527 households evicted);

c. long-time residents (approximately 30%) forced to move abruptly to keep from being evicted;

d. bank accounts and retirement funds depleted;

e. multiple loans (some with very high interest) owed to pay arrears;

f. children left without after-school care that parents no longer could afford.

96. Because the Mitchell Lama program does not factor, or consider, or use income percentages (30%) as a basis to determine how much rent to pay, before HUD approved the rental increases the majority of Linden Plaza's tenants and households were paying much less than 30% of their income for rent.  Once the federal 30% income percentage was blanketed across every household in 2008, more than 50% of Linden's 1,527 households were automatically disqualified for any rent-increase protection, such as Section 8 Enhanced Vouchers; those households found themselves facing hundreds of dollars in rent increases with little or no prior notice.

97. In addition, renovations that Skyline LLC, on behalf of Linden Plaza Preservation stated as a basis for rental increases (as reflected in the November 2007 Financial Statement) were never performed, or have been performed insufficiently.

98. Overall, living conditions have worsened since the renovations because the quality of each and every supposed upgrade conducted during the "Major Capital Repair/HUD decoupling, was substandard, over-priced, and inferior to work before.

99. For example, holes left in hallway walls/wall borders, and behind kitchen cabinets have caused an explosion in vermin found around the common areas and many apartments.

100. The imitation bath-fitter wraparound traps moisture between the wall and the wraparound, and has caused a mold outbreak in most, if not all 1,527 apartments.

101. Heating system and electrical system: under-heating/overheating and electrical wiring problems found during NYSERDA's energy audit in 2006, were never addressed-despite NYSERDA's official, written recommendations to make those energy saving, cost-saving upgrades immediately.

102. Elevator breakdowns in Linden Plaza are chronic and dangerous. On a regular basis FDNY has extricated passengers trapped in elevators in all five buildings. In 2016, an elevator plunged fifteen stories-with a passenger on board.

103. As a result of these failures, Linden Plaza has received a number of serious housing code violations over the last 8 years.

104. In addition, Linden Plaza was labeled as one of NYS Senator Jeffrey Klein's "Dirty Dozen" in a report prepared by Senator Klein in 2013. This senate report highlights the health hazards from the overwhelming presence of mold and the infestation of vermin throughout the development, all also after the HUD's decoupling and renovation rent increases.

105. In March 2017, in a Tenant Association - Management meeting, representatives from RY Management informed more than 15 members of the Tenant Association that the entire elevator system in all five buildings and both outside elevators, was scheduled to be completely replaced.

106.   In this vein, Robert Vaccarello informed Plaintiff Pamela Lockley in August 2017, that the Owner would be seeking a further rental increase to cover the cost of the elevator systems replacement.

107.   Owner plans to ask for new increases to cover this cost, despite fact that the projected cost of elevator renovations are already reflected in the rent increases HUD approved during the decoupling that is still being charged to the Plaintiffs and other tenants in Linden Plaza.

## FIRST CLAIM FOR RELIEF

*(Administrative Procedures Act- 5 U.S.C. § 701)*

108.   Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

109.   Because HUD approved Owner's request for Section 236 rental increases that are based (i) on false certifications, (ii) projected costs that never materialized, (iii) items that are not permitted to be included as operating expenses, the rental increases are (i) contrary to Plaintiffs' constitutional property right, (ii) in excess of statutory jurisdiction, or authority, or (iii) without observance of procedure required by law within the meaning of 5 U.S.C. § 706.

110.   Plaintiffs are persons suffering legal wrongs within the meaning of 5 U.S.C. § 702, because, as a direct and proximate result of Defendants' unlawful acts, they have been deprived of their right to affordable housing or to pay no more in rent than the law requires.

111. Accordingly, Plaintiffs are entitled to: (i) an injunction nullifying HUD's approval of the rental increases and requiring the recalculation of rental amounts based on permitted items, (ii) actual and punitive damages, and; (iii) any other relief this Court deems appropriate.

## SECOND CLAIM FOR RELIEF

*(State Misrepresentation or Fraud Claim Under Court's Supplemental Jurisdiction – 28 U.S.C. § 1367)*

112. Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

113. Through its concealment of information that it had a duty to disclose to Plaintiffs, Defendants Linden Plaza Associates and Linden Plaza Preservation, L.P. have defrauded Plaintiffs and deprived them of their right to comment on all expenses that were included in their rental increases.

114. As a result of these Defendants' conduct, Plaintiffs have been injured in being deprived of their right to Mitchell Lama-specific affordable housing, in that they have been charged and compelled to pay more for rent than required by the laws of New York State

115. Accordingly, Plaintiffs request a judgment for actual and punitive damages arising from these Defendants' fraudulent conduct and equitable relief to make them whole.

## THIRD CLAIM FOR RELIEF

*(State Rental Overcharge Claim Under Court's Supplemental Jurisdiction – 28 U.S.C.§ 1367)*

116. Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

117. By charging Plaintiffs rents based on items that are not permitted to be included in a Mitchell-Lama budget and items that they concealed from Plaintiffs, Defendants Linden Plaza Associates, L.P. and Linden Plaza Preservation, L.P. have charged Plaintiffs more for rent than permitted under law.

118. Accordingly, Plaintiffs request a judgment for trebled actual damages based on these Defendants' willful overcharge.

## FOURTH CLAIM FOR RELIEF

### *(42 U.S.C. § 1983)*

119. Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

120. Defendant HPD is a person within the meaning of 42 U.S.C. § 1983

121. Through its practice of approving rental increases ultimately based on items that are not permitted to be considered under state law, Defendants have deprived Plaintiffs of their due process property interest in affordable housing, including their rights to pay no more in rent than required under the Mitchell Lama law or their right to rent-stabilized tenancies.

122. As a result, Plaintiffs have been injured in being deprived of their property interest in affordable housing in having to pay more in rent than required by law.

123. Accordingly, Plaintiffs request an order requiring Defendant HPD to rescind its approval of rental increases and to reconsider any applications for rental increases based on permitted data.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(A) An order granting Plaintiffs class certification;

(B) A permanent injunction and other equitable relief nullifying the rental increase orders;

(C) Actual and punitive damages for Defendants' conduct

(D) Costs and disbursements incurred with this action, including reasonable attorney's fees and expenses under any statute or law authorizing the recovery of such costs, disbursements, fees, and expenses, and;

(E) Such other and further relief as this Court deems just and proper.


DATED:      Brooklyn, New York
            January 10, 2018

                                  Gregory E. Louis (GL6417)
                                  Brooklyn Legal Services Corporation A
                                  260 Broadway, 2nd Floor
                                  Brooklyn, New York 11211
                                  (718) 487-2339