UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

MARY DeSUZE, LOUISE GRANT, PETRA
MONTGOMERY, CARLOTA BROWN, LEONARD
ANDRE, RENEE AVENT, ARLENE HIPP,
DEBORAH PRIESTER, ANGELA JONES, ELVIA
SCHARSCHMIDT, and PAMELA LOCKLEY, for
themselves and other similarly situated current or
former tenants of Linden Plaza;

                                            Plaintiffs,

                    -against-

BEN CARSON, SECRETARY OF THE UNITED
STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, THE UNITED STATES
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT; LINDEN PLAZA
PRESERVATION L.P.; LINDEN PLAZA
ASSOCIATES, L.P.; and CITY OF NEW YORK,

                                            Defendants.
----------------------------------------------------------------------X



**MEMORANDUM & ORDER**

**18-CV-180 (NGG) (RER)**



FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★   MAR 0 5 2020   ★
BROOKLYN OFFICE

NICHOLAS G. GARAUFIS, United States District Judge.

## I.    BACKGROUND

Plaintiffs are current or former tenants of Linden Plaza, an affordable housing complex in

Brooklyn, New York. (Amended Complaint ("Am. Compl.") (Dkt. 23) ¶¶ 2, 7.) Linden Plaza,

although privately owned, receives both federal mortgage interest assistance under Section 236

of the National Housing Act of 1934, codified at 12 U.S.C. § 1715z-1 *et seq.*, and various state

incentives under Article 2 of New York's Private Housing Finance Law. (*Id.* ¶¶ 39, 40.) In

exchange, Linden Plaza is required to provide affordable housing and adhere to a multi-faceted

regulatory scheme if it seeks to raise tenants' rents. (*Id.* ¶¶ 26-37.)

1

Plaintiffs bring claims under the Administrative Procedure Act, 42 U.S.C. § 1983, and New York common law against Defendants United States Department of Housing and Urban Development ("HUD") and its Secretary, Ben Carson (the "HUD Secretary"), the City of New York (the "City"), as well as Linden Plaza Preservation L.P. and Linden Plaza Associates, L.P. (collectively, the "Linden Defendants"). (*Id.* ¶¶ 121-136.) Before the court are the motions to dismiss of HUD, the City, and the Linden Defendants. For the reasons set forth below, the motions to dismiss are GRANTED.

### A. Facts

#### 1. Section 236 Regulations

Section 236 of the National Housing Act of 1934 authorizes the HUD Secretary to make "periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families." 12 U.S.C. § 1715z-1(a). Under Section 236, HUD may continue to make these interest reduction payments ("IRP") for a mortgage that has been refinanced if the owner "enters into such binding commitments as the Secretary may require . . . to ensure that the owner will continue to operate the project in accordance with all low-income affordability restrictions." *Id.* § 1715z-1(e)(2). This process—whereby the IRPs are separated from the original mortgage—is known as "decoupling" because, while the landlord continues to receive IRP assistance from HUD, that assistance is severed from the original Section 236 mortgage. (Am. Compl. ¶ 22.)

The decoupling process depends, among other things, on whether the owner's mortgage is insured by HUD. If it is, the owner proposing to refinance must submit an action plan to HUD, and HUD must make a finding that there are binding commitments to ensure the building will be retained for affordable housing and that existing tenants will not be displaced. *See* 12 U.S.C. §

4112; 24 C.F.R. § 245.330. Where a mortgage is not insured by HUD, however, Section 236 requires an owner wishing to refinance to take different steps. In general, owners of such non-insured buildings submit all relevant materials to the state or local public housing agency administering assistance (the "PHA"), which, in turn, reviews the information and submits it to HUD for approval. *Id.* Under Section 236(e)(2), however, such an owner may "elect to refinance [its] Section 236 mortgage by providing a written proposal to [HUD's] Multifamily Hub [that has] jurisdiction for the project." U.S. Dep't of Housing & Urban Dev., Notice H 00-8 (May 16, 2000) ("Notice 2000-08").[1] Regardless, while HUD establishes federal rent parameters, the PHA retains authority to ensure that proposed rent increases conform with state and local restrictions. (*Id.* at § 4.) The relevant PHA in this case is New York City's Department of Housing Preservation and Development ("HPD"). (Am. Compl. ¶ 44.)

While the PHA retains many obligations under the Section 236 regulatory scheme, the statute outlines specific procedural requirements that HUD must follow when approving a proposed refinancing and rent increase. In particular, the subsection titled Tenant Participation in Multifamily Housing Projects, explains that "the purpose of this [sub]section is to recognize the importance and benefits of cooperation and participation of tenants in creating a suitable living environment in multifamily housing projects." 12 U.S.C. § 1715z-1b(a). To further the goal of tenant "cooperation and participation," Section 236 requires that the HUD Secretary "shall assure" that "tenants have adequate notice of, reasonable access to relevant information about, and an opportunity to comment on" certain actions taken by HUD, including "an owner's request for rent increase." *Id.* § 1715z-1b(b).

---

[1] Notice 2008-08, which was the relevant HUD guidance at the time of the rent increase at issue in this case, has been replaced by Notice H 2013-25. *See* U.S. Dep't of Housing & Urban Dev., Notice H 2013-25 (Aug. 23, 2013).

## 2. Mitchell-Lama Program and Linden Plaza

Article 2 of New York's Private Housing Finance Law ("Mitchell-Lama") provides incentives such as partial property tax exemptions and tax-exempt mortgage financing to private enterprises that construct and maintain low cost housing accommodations for moderate to middle-income residents. (Am. Compl. ¶¶ 27-30; 41 N.Y. Priv. Hous. Fin. Law §§ 22-23.) In exchange for these benefits, housing companies are subject to numerous statutory restrictions and regulatory oversight, including with respect to the rent they may charge. (*Id.*) If a housing company seeks to increase rents in a Mitchell-Lama building, it must apply to HPD (which supervises Mitchell-Lama developments in New York City) for approval and undergo a public hearing process. (*See* Rules of the City of New York, tit. 28, ch. 3 §§ 3-10.)

Linden Plaza is a Mitchell-Lama housing complex in Brooklyn that initially opened in 1971. (*Id.* ¶¶ 38-39.) In 1972, the New York City Housing Development Corporation ("HDC") issued a mortgage to Linden Plaza insured under Mitchell-Lama. (*Id.*) A year later, Linden Plaza began receiving IRP assistance from HUD. (*Id.* ¶ 40.) Because of its status as a Mitchell-Lama project that also receives IRP subsidies, Linden Plaza is supervised by HPD, and all proposed refinancing or rent increases pursued by Linden Plaza's owners must follow Section 236 and Mitchell-Lama regulations. (*Id.* ¶¶ 37-47.)

## 3. The City's New Housing Marketplace Plan

Plaintiffs allege that HPD supervises Mitchell-Lama buildings like Linden Plaza under the City's New Housing Marketplace Plan (the "Housing Plan"). (*Id.* ¶ 99.) Plaintiffs allege that the Housing Plan, which was in operation between 2003 and 2014, included a Mitchell-Lama preservation strategy. (*Id.*) The preservation strategy—allegedly implemented because it would be more cost-effective than new construction—sought to preserve over 100,000 Mitchell-Lama

units by encouraging owners to extend affordability commitments through tax abatements, preservation rehabilitation loans, and mortgage refinancing. (*See generally* Decl. of Gregory Louis ("Louis Decl.") & Exs. thereto (Dkt. 46-1).) One Plaintiff, Pamela Lockley, a former President of the Linden Plaza Tenant Association Council, received a letter from HUD in July 2015 that "advised her that the [Linden Plaza] preservation transaction arose out of the Mayor and Defendant City of New York's New Housing Marketplace Plan and the numerous programs developed out of this plan to respond to the problem of rising operating cost and aging building systems and structure." (*Id.*) Plaintiffs likewise point to the preservation transaction at Janel Towers, another Mitchell-Lama building in New York City, as evidence of the Housing Plan's preservation strategy. (Am. Compl. ¶ 102.)

4.   The Linden Plaza Preservation Transaction and 2008 Rental Increase

In May 2007, the Linden Defendants served Plaintiffs and other tenants with notice that Linden Plaza was applying to both HUD and HPD for permission to increase rents. (*Id.* ¶ 59.) The notice advised that copies of the materials the Linden Defendants would be submitting to HPD and HUD would be made available to tenants for inspection and review. (*Id.*) In June 2007, the Linden Defendants provided Plaintiffs and other tenants with a document entitled "Application by Linden Plaza Associates, L.P. for Rent Increase," which included, among other things, a financial breakdown of "(i) projected income and expenses, (ii) other income, (iii) operating expenses, and (iv) utility expenses." (*Id.* ¶ 62). Plaintiffs allege that, at the time, they believed that this document represented the full extent of the costs on which the proposed rent increase would be based. (*Id.*)

Also in June 2007, the Linden Defendants—through their acquisition consultant Skyline LLC—applied to HUD for approval of decoupling and rent increases (the "HUD Application").

(*Id.* ¶ 48.) A month later, in July, the Linden Defendants filed a separate application to HPD for a Mitchell-Lama rent increase (the "HPD Application"). (*Id.* ¶ 49.) On August 27, 2007, tenants attended a Mitchell-Lama rent-increase hearing regarding the HPD Application. (*Id.* ¶ 53.) At the hearing, tenants were not presented with the HUD Application and were denied the right to comment—either at the hearing or subsequently in writing—on the HUD Application's proposed rent increase. (*Id.*)

Plaintiffs allege that their inability to review and comment on the HUD Application was particularly problematic because the HUD Application and the HPD Application did not contain the same information and projected costs. According to a November 15, 2007 financial statement (the "November 2007 Statement"), the HUD Application included $50.8 million in acquisition costs, $73.1 million of rehabilitation costs, and a $16 million developer fee cost. (*Id.* ¶¶ 79, 82.) These costs were not submitted as part of the HPD Application (and, in turn, HPD did not submit a pre-approval of these costs to HUD). (*Id.* ¶¶ 49, 69.) Nonetheless, HUD approved the HUD Application's proposed rent increases on December 14, 2007. (*Id.* ¶ 50.) In response to HUD's approval of the HUD Application, HPD cancelled its approval of the HPD Application, and replaced the Mitchell-Lama rents with the new rents approved by HUD. (*Id.*)

### 5. Post-2008 Factual Discoveries

Plaintiffs allege that, at the time of the 2008 rent increase, they did not know (and could not have known) (1) the fact that Linden Plaza submitted the HUD Application in addition to the HPD Application; (2) the contents of the HUD Application and (3) the discrepancies between the cost projections in the HUD Application and the actual costs associated with the Linden Plaza preservation transaction. (*See id.* ¶¶ 75-91.) However, Plaintiffs allege that they came to learn of

these discrepancies in the years to come, during which time many of the Plaintiffs sought legal and regulatory relief from the 2008 rent increase.

In July 2008, shortly after HPD approved the rent increase at the center of this case, Linden Plaza Leaseholders Corporation (whose members were tenants living at Linden Plaza apartments) filed an Article 78 proceeding in state court, arguing that HPD's approval of the Linden Defendants' rent increase request was arbitrary and capricious and against controlling law. (*See* July 28, 2008 Not. of Pet., Index No. 21896/08 & Verified Pet. (Dkt. 41 at ECF 31-44).) By joint stipulation on January 12, 2009, the parties agreed to mark-off the Article 78 proceeding, and, because the Leaseholders Corporation did not seek to restore the proceeding to the state court calendar within one year, the proceeding was deemed abandoned pursuant to CPLR § 3404 (*See* Joint Stip. Jan. 12, 2009 (Dkt. 41 at ECF 48-49).)

In 2011, Plaintiffs DeSuze and Grant commenced a lawsuit in Kings County Supreme Court, alleging that certain "HUD Excess charges" assessed by the Linden Defendants were not authorized under Mitchell-Lama.[2] (*Id.* ¶ 75.) Plaintiffs allege that it was not until April 2011, during discovery in that action, that they learned that HUD had approved decoupling expenses in the 2008 rent increase.[3] (*Id.* ¶¶ 71-72.) Until that point, Plaintiffs allege, they did not know (and could not have known) that the Linden Defendants had submitted a proposal directly to HUD or that HUD had considered any decoupling expenses as a basis for the 2008 rent increase. (*Id.*)

In 2013, Plaintiffs DeSuze, Grant, and Montgomery filed a request under New York's Freedom of Information Law ("FOIL") with HPD seeking all documents relating to the 2008 preservation transaction and rent increase applications. (*Id.* ¶ 76.) Also in 2012 and 2013, all but

---

[2] That suit has been making its way through the state courts and is still ongoing. *See De Suze v. Linden Plaza Pres.*, 24 N.Y.S. 3d 370 (2d Dep't 2016).

[3] Plaintiff Montgomery alleges she did not learn of HUD's involvement in the 2008 rent increase until she was added to the state court action in 2012. (Am. Compl. ¶¶ 71-72.)

one of the Plaintiffs filed a *pro se* lawsuits in this district against HUD, HPD, the Linden

Defendants, and the New York State Homes and Community Renewal Commission. (*Id.* ¶ 77;

*see also DeSuze et al v. Donovan*, No. 13-CV-2093 (JG) (E.D.N.Y. Sept. 3, 2013) (the "2013

Federal Action").)[4] The gravamen of these complaints was that "HUD failed to properly

supervise HPD and HDC in their administration of the local rent programs at Linden Plaza."

(Transcript of Oral Argument in 2013 Federal Action (Dkt. 47-1 at ECF 1-38.) Judge Gleeson

granted HUD's motion to dismiss, finding that Plaintiffs' lacked standing and that their suit was

barred by sovereign immunity. (*Id.* at pp. 33-34.) Plaintiffs allege, however, that it was not until

August 2013, when HUD's attorney gave Plaintiffs a copy of the November 2007 Statement

during a hearing in the 2013 Federal Action, that Plaintiffs finally learned the specific costs

included in the HUD Application and considered by HUD when HUD approved the 2008 rent

increase (*Id.* ¶¶ 79-82.)

Plaintiffs allege they also submitted numerous FOIL requests to HPD for several years

after the 2008 increase. (*Id.* ¶ 85.) In March 2016, HPD's FOIL Appeals Unit provided Plaintiffs

with a memorandum dated April 8, 2014 (the "HPD FOIL Memorandum"), stating that the actual

cost of the Linden Plaza renovations was only $20 million. (*Id.* ¶ 86.) Plaintiffs allege that this

figure conflicts with the information contained in the November 2007 Statement, which

projected renovation costs to be $57 million, *id.* ¶ 87, and other "HPD and HD[C]

documentation," which, according to Plaintiffs, puts the renovation costs "[at] $0," *id.* ¶ 91.

Plaintiffs allege that, despite the difference between the projected and actual renovation costs,

---

[4] Also in 2013, Plaintiffs Brown, Andre, Avent, Hipp, Priester, and Scharsschdmit likewise commenced *pro se* actions in this district, which were subsequently joined with the 2013 Federal Action plaintiffs before Judge Gleeson.

neither HUD nor HPD has directed the Linden Defendants to "reduce the rents to reflect the actual cost of the renovations." (*Id.* ¶ 91.)

6. Subsequent Rent Increases and Current Conditions

In 2014, HUD approved another rent increase for Linden Plaza. (*Id.* ¶ 73.) Plaintiffs allege that, as a result of the 2008 increase and the 2014 increase, Plaintiffs have seen their rent increase by an average of roughly 110%. (*Id.*) Certain Plaintiffs have had nearly 140% rent increases. (*Id.*) In 2017, RY Management, the company that manages Linden Plaza, informed Plaintiffs that the Linden Defendants intended to request another rent increase. (*Id.* ¶¶ 119-120.) According to Plaintiffs, the Linden Defendants planned to justify the rent increase, at least in part, by the need to repair the elevator system, though elevator repairs were part of the Linden Defendants' justification for the 2008 rent increase. (*Id.*) In June 2018, the Linden Defendants distributed to Plaintiffs and other tenants a notice of intent to submit a request to HPD and HUD for approval of an increase in maximum permissible rents. (*See* June 29, 2018 Linden Plaza Notice to Tenants (Dkt. 46-1) at 4-5.)

Plaintiffs allege that, despite the multiple rent increases over the last decade, living conditions in Linden Plaza have significantly deteriorated. (*Id.* ¶¶ 119-117.) In particular, Plaintiffs allege that the renovations used as a basis for the rent increases were poorly performed or never performed at all. (*Id.* ¶ 110.) Plaintiffs allege these inadequate renovations have led to an increase in vermin, pests, and mold due to inadequate renovations, and that Plaintiffs and other tenants have had to cope with frequent elevator breakdowns. (*Id.* ¶¶ 112-115.)

B. Procedural History

Plaintiffs filed their Complaint (Dkt. 1) in this case on January 11, 2018 and their Amended Complaint on June 16, 2018. Defendants HUD, the City, and the Linden Defendants

all moved to dismiss, and Plaintiffs have opposed each motion. (*See* HUD Mot. to Dismiss ("HUD Mem.") (Dkt. 47); HPD Mot. to Dismiss ("HPD Mem.") (Dkt. 41); Linden Plaza Mot. to Dismiss and Mot. for Summ. J. ("LP Mem.") (Dkt. 44); Plaintiffs' Consl. Mot. in Opp'n ("Opp.") (Dkt. 42); HUD Reply in Support of Mot. to Dismiss ("HUD Reply") (Dkt. 48); HPD Reply in Support of Mot. to Dismiss ("HPD Reply") (Dkt. 43); Linden Plaza Reply in Support of Mot. to Dismiss and Mot. for Summ. J. ("LP Reply") (Dkt. 45).)

## II.     LEGAL STANDARD

### A.     Rule 12(b)(1)

Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). Where, however, the facts are disputed, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Id.* (quoting *Makarova*, 201 F.3d at 113). When a defendant moves to dismiss both for lack of subject matter jurisdiction and on other grounds such as failure to state a claim upon which relief can be granted, the court must address the issue of subject matter jurisdiction first. *See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

### B.     Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In deciding Defendants' motion to dismiss, the court "will accept all factual allegations in the [c]omplaint as true and draw all reasonable inferences in [Plaintiffs'] favor." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). However, the court will "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court must then evaluate the "well-pleaded factual allegations" and "determine whether they plausibl[y] give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Even when, before discovery, "facts are peculiarly within the possession and control of the defendant," the complaint must still provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegality." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

## III.    DISCUSSION

### A.    Claims against HUD

Plaintiffs seek relief against HUD pursuant to Section 706 of the APA. In particular, Plaintiffs allege that HUD violated Section 1715z-1b of the National Housing Act by failing to ensure that Plaintiffs had "adequate notice of, reasonable access to relevant information about, and an opportunity to comment on. . . [the Linden Defendants'] request for rent increase." 12 U.S.C. § 1715z-1b(b); *see also* Am. Compl. ¶¶ 49-52. Plaintiffs also argue that HUD violated the APA when it accepted a proposal for a rent increase directly from the Linden Defendants without first allowing HPD the opportunity to review and preapprove it, in violation of 24 CFR § 245.330. (Am. Compl. ¶ 69.)

11

HUD argues that this court lacks jurisdiction because Plaintiffs lack Article III standing and because HUD's actions are not subject to judicial review under the APA. (HUD Mot. at 11-16; HUD Reply at 2-6, 12-14.) HUD also argues that Plaintiffs' claim must be dismissed because it is (1) time-barred and (2) precluded under both the doctrines of collateral estoppel and *res judicata*. (HUD Mot. at 6-10; HUD Reply at 7-12.) The court finds that Plaintiffs have standing to pursue their claim under § 1715z-1b and that HUD is subject to judicial review. However, because the court finds that Plaintiffs' § 1715z-1b claim is time-barred, the court grants HUD's motion to dismiss.

> 1.   Standing

To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate (1) "injury in fact," (2) a "causal connection" between the injury and complained-of conduct, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). HUD argues that Plaintiffs fail to demonstrate injury in fact because "even assuming . . . HUD did not comply with applicable procedures, HPD was responsible for making the final decision on the actual rent level." (HUD Mot. at 5.) HUD likewise argues that due to HPD's final authority to set rents (and ensure Linden Plaza's compliance with Mitchell-Lama requirements), Plaintiffs fail to demonstrate both a causal connection between HUD's violation of its own procedures and Plaintiffs' injury and a means by which a favorable ruling would remedy that injury. (HUD Reply at 2-6.)

HUD's argument, however, misconstrues Plaintiffs' injury. HUD's position is premised on framing Plaintiffs' injury as simply being charged illegally inflated rents. Yet, Plaintiffs' APA claim seeks relief for violations of their procedural rights under 12 U.S.C. § 1715z-1b and 24

C.F.R. § 245.330. The question, therefore, is not whether Plaintiffs have standing to assert a claim solely for allegedly inflated rents; rather, it is whether Plaintiffs have demonstrated they have standing to assert their procedural rights.

Plaintiffs have standing to assert procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of [their] standing." *Lujan*, 504 U.S. at 573 n.8. In addition, a "litigant to whom Congress has accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007) (citation and internal quotation marks omitted). "[W]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 518.

Here, Plaintiffs fail to establish standing for their claim under 24 C.F.R. § 245.330. That is because Plaintiffs fail to demonstrate that Congress vested tenants with a procedural right to have a local PHA—such as HPD—review an owner's proposed rent increase before it is sent to HUD. While it is true that 24 C.F.R. § 245.330(a)(2) requires relevant rent increase materials to be sent to HPD before HUD, transactions under § 1715z-a(e)(2) need not follow that procedure. Indeed, as Notice 2000-08 (on which both Plaintiffs and HUD rely) explains, "the project's mortgagor or prospective mortgagor may elect to refinance the Section 236 mortgage by providing a written proposal to the [HUD] Multifamily Hub having jurisdiction for the project." Notice 2000-08 at § 9. Because Plaintiffs cannot establish a procedural right under Section 236 to have all rent increase proposals reviewed by HPD before HUD, they fail to establish the necessary injury to establish standing.

Plaintiffs' claim under Section 1715z-1b, however, is a different story. Congress established explicit procedural protections for tenants in multifamily housing projects receiving mortgage assistance from HUD. Section 1715z-1b's stated purpose is to "recognize the importance and benefits of cooperation and participation of tenants in creating a suitable living environment in multifamily housing projects." 12 U.S.C. § 1715z-1b(a). To fulfill that purpose, Subsection (b) enumerates the "Rights of Tenants" which include that the HUD Secretary "shall assure" that "tenants have adequate notice of, reasonable access to relevant information about, and an opportunity to comment on . . . an owner's request for [a] rent increase." *Id.* § 1715z-1b(b). This statutory language manifestly establishes that Plaintiffs have procedural rights designed to "protect some threatened interest," namely, an improper increase of their rent. Further, there is "some possibility" that if HUD had followed Section 1715z-1b and provided Plaintiffs with an opportunity review and comment on the HUD Application, the result would have been different. *See Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 156 (E.D.N.Y. 2017).

To suggest otherwise and adopt HUD's reasoning would only serve to frustrate the explicit aims of Section 236. While it may be the case that HPD—and not HUD—was ultimately responsible for approving the Linden Plaza rent increase (and ensuring compliance with Mitchell-Lama), HUD nonetheless owed statutory obligations to Plaintiffs and other tenants. To deny Plaintiffs standing to assert a claim that HUD failed to meet those obligations merely because other actors in a complex federal, state, and local regulatory scheme had final authority over setting rents would insulate HUD from judicial scrutiny and render Plaintiffs' procedural protections—as codified by Congress—meaningless. Accordingly, Plaintiffs have Article III standing to assert their APA claim against HUD alleging HUD failed to comply with Section 1715z-1b.

## 2. Judicial Review under the APA

HUD next contends that, even if it failed to comply with Section 1715z-1b, it is not subject to judicial review under the APA. (HUD Mot at 13-15; HUD Reply at 12-14.) The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," and waives the government's sovereign immunity in actions for relief "other than money damages" against officials acting in their official capacity. 5 U.S.C. § 702. The cause of action provided under the APA applies to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

"[T]he Administrative Procedure Act's generous review provisions must be given a hospitable interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140-41 (1967) (citations and internal quotation marks omitted), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). However, the APA's waiver of immunity does not extend to cases where: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). These exceptions are to be construed narrowly in light of the APA's strong presumption in favor of judicial review. *See Abbott Labs.*, 387 U.S. at 141.

HUD argues that the APA's waiver of sovereign immunity does not apply in this case because (1) Plaintiffs have an adequate alternate remedy (2) no statute or regulation requires HUD to take discrete action with respect to the rents charged to Linden Plaza tenants, and (3) HUD's enforcement decisions are committed to agency discretion. (*See* HUD Mot. at 13-15.) The court disagrees and holds that HUD's alleged failure to comply with Section 1715z-1b is subject to judicial review under the APA.

As a preliminary matter, HUD's reliance on the Supreme Court's admonition in *Heckler v. Chaney* regarding the "general unsuitability for judicial review of agency decisions to refuse enforcement" is inapposite. 470 U.S. 821, 834 (1985). Here, unlike in *Heckler*, the issue is not whether HUD refused enforcement, but whether HUD followed its own procedural requirements. In addition, HUD's argument that "Plaintiffs cannot point to any statute or regulation containing a mandatory duty for HUD to take discrete action," HUD Mot. at 14, is likewise unavailing. To the contrary, as discussed above, Section 1715z-1b requires HUD to take certain steps to ensure certain "[r]ights of tenants," which HUD has allegedly not done. 12 U.S.C. § 1715z-1b.

HUD's remaining argument for why it is not subject to judicial review under the APA in this case is that Plaintiffs have an alternative adequate remedy. In *Darby v. Cisneros*, the Supreme Court explained that "Congress intended [the adequate alternative remedy] provision simply to avoid duplicating previously established statutory procedures for review of agency actions." 509 U.S. 137, 146 (1993). And, in *Bowen v. Massachusetts*, the Supreme Court held that the adequate alternative limitation in § 704 "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." 487 U.S. 879, 903 (1988). Construing § 704's limitation "narrowly," the court finds that Plaintiffs claims against both HUD and the Linden Defendants do not offer an "adequate" alternative remedy to their claim that HUD failed to follow its own statutory requirements. There is no question that the APA provides district courts with the authority to review this type of challenge; in fact, the APA explicitly requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be [, *inter alia*,] without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Accordingly, HUD's alleged failure to comply with Section 1715z-1b is subject to judicial review.

3. <u>Statute of Limitations</u>

HUD argues that Plaintiffs' APA claim is barred by 24 U.S.C. § 2401's six-year statute of limitations because their claim accrued when HUD approved the Linden Plaza rent increase in 2008. (HUD Mot. at 10; HUD Reply at 7.) Plaintiffs contend that their claim did not accrue until August 2013 and is therefore timely. (Opp. at 14.) In the alternative, Plaintiffs argue the court should exercise its discretion and equitably toll the statute of limitations. (*Id.* at 19.)

Under 24 U.S.C. § 2401, every civil action commenced against the United States must be commenced within six years after the right of action accrues. A federal claim accrues "once [a] plaintiff knows or has reason to know of the injury that serves as the basis for the action." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (citations and internal quotations omitted). For the purposes of accrual, "know[ledge] of the injury" means knowledge of both the harm and the cause of harm. *Barrett v. United States*, 689 F.2d 324, 333 (2d Cir. 1982).

Plaintiffs argue that their APA claim under Section 1715z-1b did not accrue until August 23, 2013, which is "when [Plaintiffs] first learned of the specific expenses that justified the rent increase and that were not presented to tenants in the 2007 Mitchell-Lama hearing." (Opp. at 16.) Plaintiffs base this accrual date on the fact that an attorney for HUD gave Plaintiffs a copy of the November 2007 Statement, which they allege first alerted them to the actual costs HUD considered when it approved the HUD Application. (Am. Compl. ¶ 68.)

Yet, Plaintiffs were aware as early as 2011 that HUD had approved the Linden Defendants' Section 236(e)(2) preservation proposal and request for a rent increase. The Amended Complaint alleges as much, noting that Plaintiffs DeSuze and Grant "were notified, for the first time of HUD's approval of decoupling increases, in April 2011 during their appearance in a state court action." (Am. Compl. ¶ 71.) The manner by which Plaintiffs DeSuze and Grant

became aware of this information was through a December 14, 2007 letter (the "December 2007 Letter") from HUD to the Linden Defendants' acquisition consultant, Skyline, LLC, approving the HUD Application, which Plaintiffs alleged in the 2013 Federal Action to have received in March 2011 (and which Plaintiffs appended to the 2013 complaint as an exhibit). *See* Compl., *DeSuze v. Donovan*, E.D.N.Y. No. 13-CV-2093 (Dkt. 1 at ECF 50-54). And, as HUD points out, the December 2007 Letter makes clear that HUD had approved a rental increase request: (1) that was not first submitted to the City, (2) that included decoupling expenses, and (3) the details of which Plaintiffs had not been made aware of at the time of the original approval in 2008. (*See* HUD Reply at 9 n.6.) Therefore, the statute of limitations began to run by March 2011 at the latest when Plaintiffs knew or should have known that HUD had violated their procedural rights under Section 1715z-1(b).

In their brief, Plaintiffs distinguish between receiving the December 2007 Letter in March 2011 and receiving the November 2007 Statement in August 2013. (Opp. at 14.) Plaintiffs suggest that it was not until that latter date that they "discovered the specific decoupling expenses—expenses that may *not* be included in Mitchell-Lama rents—that justified the 2008 rent increase." (*Id.*) Yet, the distinction between, on the one hand, knowing that HUD approved a rent increase directly from the Linden Defendants without giving tenants an opportunity to comment on the proposal and, on the other hand, knowing the "specific decoupling expenses" that HUD in fact reviewed in that process, is immaterial for the purposes of when the statute of limitations begins to run. Once Plaintiffs received HUD's December 2007 Letter in 2011, they were aware (or should have been aware) that they potentially had a claim against HUD for failing to follow the procedures outlined in Section 1715z-1b. Because Plaintiffs' commenced this suit more than six years after the time of accrual, their claim is time-barred.

Plaintiffs attempt to save their claim by invoking the doctrine of equitable tolling. (Opp. at 19-21.) "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citation omitted). "The Second Circuit has explained that the type of situation warranting equitable tolling is one where a plaintiff could show that it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action." *Lefebvre v. Morgan*, 234 F. Supp. 3d 445, 459 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). For that reason, equitable tolling is "only appropriate in rare and exceptional circumstances." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (citation and internal quotation marks omitted) (alterations adopted).

Here, Plaintiffs fail to demonstrate that some "extraordinary circumstance" stood in the way of filing their APA claim within the statute of limitations. Plaintiffs contend that "they were prevented from filing a timely claim by Defendants' refusal to provide the information that revealed Defendants' wrong doing." (Opp. at 21.) However, as discussed above, Plaintiffs *did* receive information as early as 2011 that should have alerted them to their potential Section 1715z-1(b) injury, and they can point to no other reason for why they did not commence this suit until January 2018. *See Watson v. United States*, 865 F.3d 123, 133 (2d Cir. 2017) ("[e]quitable tolling [may not] be premised on . . . pro se status, or ignorance of the right to bring a claim." (citation omitted)). Thus, no "exceptional circumstances" exist to warrant application of the equitable tolling doctrine to Plaintiffs' APA claim.

Accordingly, HUD's motion to dismiss is granted.

**B.    Claims against the City**

Plaintiffs also bring a claim under 42 U.S.C. § 1983 against the City. (*See* Am. Compl. ¶¶ 132-136.) Plaintiffs allege that the City's New Housing Marketplace Plan constitutes a discriminatory policy or practice that has deprived Plaintiffs of "their constitutional or statutory property interest in or right to reduced rentals or affordable housing in having to pay more in rent than they otherwise would have." (*Id.* ¶ 135.) Plaintiffs' Section 1983 claim against the City has a three-year statute of limitations. *See Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015). Plaintiffs' filed their Amended Complaint in 2018, well beyond the relevant limitations period but argue that their claim is timely under the continuing violation doctrine. (*See* Opp. at 18-19.)

1.    Continuing Violation Doctrine

The continuing violation doctrine, where applicable, provides an "exception to the normal knew-or-should-have-known accrual date." *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999). It applies to claims "composed of a series of separate acts that collectively constitute one unlawful [ ] practice." *Washington v. Cty. Of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)). "[W]hen a plaintiff experiences a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 211 (E.D.N.Y. 2014) (citation and internal quotation marks omitted) (alteration adopted). The doctrine does not apply, however, to "discrete unlawful acts, even where these acts are part of a serial violation, but [only] to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citations and internal quotation marks omitted) (alterations adopted). That is so even when the discrete acts are

20

"undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin v. Port Authority of N.Y. & N. J.*, 685 F.3d 135, 157 (2d Cir. 2012). Such discrete acts are distinct from, for example, an alleged hostile work environment, which by its "very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. In those circumstances, "[s]uch claims are based on the cumulative effect of individual acts . . . [such that] a single act of harassment may not be actionable on its own." *Id.*

Courts in this circuit "have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances." *Crosland v. City of N.Y.*, 140 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), *aff'd sub nom. Crosland v. Safir*, 54 F. App'x 504 (citation and internal quotation marks omitted). "Compelling circumstances have been found where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy [that is] alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness." *Ruane v. Cty. Of Suffolk*, 923 F. Supp. 2d 454, 459-60 (E.D.N.Y. 2013) (citations and internal quotation marks omitted). In the context of claims brought under Section 1983, the Second Circuit has held that "a continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris*, 186 F.3d at 250. Instead, the claimant "must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Id.*

Here, Plaintiffs allege that the City has an unconstitutional policy of "pushing preservation transactions even where preservatio[n] transactions negatively impact tenants and violate federal and state law enshrining the property right to lower rentals." (Opp. at 19.) That

policy, Plaintiffs allege, led not just to rent increases at Linden Plaza in 2008, but also to rent increases as recently as 2016, and will lead to more rent increases in the future. (*Id.*)

The court finds that the continuing violation doctrine does not apply to Plaintiffs' claim. Specifically, the Amended Complaint fails to allege "some non-time-barred acts taken in furtherance" of the City's alleged policy of pushing preservation transactions to the detriment of tenants' constitutional rights. *Harris*, 186 F.3d at 250; *see also Panos v. Universal Forest Prods., Inc.*, No. 18-CV-2066 (KMK), 2020 WL 416445, at * 6 (S.D.N.Y Jan. 27, 2020) ("[P]laintiff does not allege that Defendants committed wrongs during the statutory period such that the continuing violation doctrine would apply."). Indeed, as the Plaintiffs note, "a claim alleging an ongoing policy or practice accrues at the time of the last action 'in furtherance of it.'" (Opp. at 18. (quoting *Harris*, 186 F.3d at 248).)

The Amended Complaint alleges that, in 2014, "HPD processed HUD's rent increase approval." (Am. Compl. ¶ 73.) It also alleges that Plaintiffs incurred rent increases in 2010, 2014, 2015, and 2016 as a result of the "2008-2010 and 2014-2016[] HUD approvals." (*Id.* ¶ 74.) Yet, the Amended Complaint does not allege any facts to suggest that the increased rents incurred by Plaintiffs in the limitations period (*i.e.* within three years of the filing of the complaint, such that the act would be timely under Section 1983's statute of limitations) were the result of the alleged "policy or practice" of "pushing preservation transactions" that Plaintiffs allege was (at least in part) the cause of the original 2008 rent increase. Without such facts, Plaintiffs fail to demonstrate the nexus between the rent increase in 2008 and the rent increase in the limitation period was the alleged HPD policy; indeed, were the 2016 rent increase simply the "continuing effect of earlier unlawful conduct," *Panos*, 2020 WL 416445 at *6, the continuing violation doctrine would not apply. And, without such a nexus, the various rent increases

incurred by Plaintiffs merely constitute "discrete" acts that do not trigger the application of the continuing violation doctrine. *See Chin*, 685 F.3d at 157. As a result, Plaintiffs' claims against the City are dismissed as time-barred.

### C.    Claims against the Linden Defendants

Plaintiffs also bring state-law fraud and misrepresentation claims against the Linden Defendants. (Am. Compl. ¶¶ 125-128.) Having determined that Plaintiffs' federal claims should be dismissed, the court sees no reason to retain jurisdiction over Plaintiffs' remaining state law claims. The court therefore declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims. *See* 28 U.S.C. § 1267(c)(3); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) ("[W]hen the federal claims are dismissed the state claims should be dismissed as well." (citations and internal quotation marks omitted)).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Dkts. 41, 44, 47) are GRANTED in full. The Clerk of Court is respectfully DIRECTED to enter judgment in favor of Defendants and close the case.

SO ORDERED.

Nicholas G. Garaufis

Dated:  Brooklyn, New York                NICHOLAS G. GARAUFIS
        March 5, 2020                     United States District Judge